57 CCPA

**SANDOZ, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**No. 5330.**

United States Court of Customs and Patent Appeals.

Dec. 18, 1969.

Almond and Baldwin, JJ., dissented.

Sharretts, Paley, Carter & Blauvelt, New York City, attorneys of record, for appellant. Eugene F. Blauvelt, Michael T. Crimmins, New York City, of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Robert Blanc, New York City, for the United States.

Before RICH, Acting Chief Judge, JONES, Judge, sitting by designation, ALMOND, BALDWIN and LANE, Judges.

RICH, Acting Chief Judge.

This appeal is from the judgment of the United States Customs Court, First Division, 60 Cust.Ct. 637, C.D. 3482, 285 F.Supp. 839, overruling appellant's pro-

test to the classification of a drug invoiced as "Digitoxin USP. XVI." "USP. XVI" means United States Pharmacopoeia, 16th edition. "Digitoxin" is the name of the drug. The product imported was the pure drug in bulk form. It appears to be a crystalline material. It was manufactured by Sandoz Ltd. of Basel, Switzerland, by a process the details of which are a trade secret.

The parties stipulated that digitoxin is of vegetable origin, that it has therapeutic or medicinal properties, that it does not contain alcohol, and that it is not edible, these agreed facts being related to the wording of the involved statutes.

The collector classified the digitoxin as a "medicinal preparation" under paragraph 5 of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55649, reading in pertinent part:

> Medicinal preparations (except any article otherwise provided for in this item and any article provided for otherwise than as a "medicinal preparation" in any item 5 or item 5 and 23 of Part I of any previous Schedule XX of the General Agreement on Tariffs and Trade). . 11½% ad val.

Appellant claims the proper classification to be under paragraph 34 of the Tariff Act of 1930, as modified by T.D. 55816, which provides (emphasis ours):

> Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and *all other drugs of vegetable* or animal *origin* (except fish oils and fish liver oils); any of the foregoing which are *natural* and *uncompounded* drugs and not edible, and not specially provided for, but *which are advanced in value* or condition [1] by shredding,

---

[1] For better understanding, paragraph 34 should be read with paragraph 1669, which provides for duty-free importation of the same drugs when "in a crude state, not advanced in value." It has not been contended by appellant that the imports here are crude. It is contended they are "advanced in value," so as to fall within paragraph 34.

grinding, chipping, crushing or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol . . . . . . 4% ad val.

The principal issue in this case centers on the question whether the imported digitoxin, a pure crystalline material, is a "natural" drug. This depends on the legal interpretation to be given to the facts respecting its production—essentially undisputed insofar as they were revealed. The Customs Court found:

> Paragraph 34 of the Tariff Act of 1930, as modified, provides *inter alia* that a drug to be classifiable thereunder must be "natural", "uncompounded", and "advanced". In our opinion, the product under consideration, in its imported condition, is not embraced by any of these required elements so as to be properly classifiable under the claimed provisions of paragraph 34 of the tariff act.

It therefore overruled the protest. We affirm on the ground that the evidence fails to show the digitoxin is a "natural" drug or such a drug "advanced in value" and find it unnecessary to reach the other question, whether the drug is "uncompounded," on which we express no opinion.

The Customs Court found the applicable law to be the holding of this court in Chemical Specialties Co. v. United States, 43 CCPA 93, C.A.D. 614 (1956), and deemed that case to be controlling. A later pertinent decision by this court, cited by the Government and not discussed by appellant, is Organon, Inc. v. United States, 50 CCPA 17, C.A.D. 812 (1963), wherein we recognized *Chemical Specialties* as a controlling precedent and discussed it at length.[2]

The preparation of the imported digitoxin was described at length by appellant's principal witness, Dr. Emil Angliker, a chemist and head of the glycosides manufacturing department of Sandoz Ltd. The import is a glycoside. The witness said he produced it. In brief, and omitting undisclosed secret details, it was produced from carefully cultivated *digitalis lanata* plants.[3] The leaves of the first year plants were harvested when mature, carefully dried to the desired moisture content, powdered, the powder mixed with water and this mixture treated in certain important undisclosed ways for a period of from some hours to four days, depending on the kind and condition of the leaves. "Cold" water was used, the temperature being very important, as is the amount of stirring. An aqueous solution of glycosides results which is separated from the leaves, purified by shaking with certain solvents, and the glycosides are then extracted from the water with chloroform or other solvents. The digitoxin may sometimes be crystallized directly or it may be necessary to separate it from other glycosides by chromatography, a process described by the witness but not important here.

It clearly appears that while the digitalis lanata leaves may contain a very small amount of digitoxin, the imported digitoxin which is produced in the course of the above-described manufacture was not present as such in the leaves, at least for the most part. It was produced from "lanatoside A" contained in the leaves, the formula of which was produced at the trial as an exhibit. Under the processing conditions, lanatoside A was converted into digitoxin by hydrolysis brought about by the action of enzymes, alleged to be present in the digitalis leaves, the enzymatic action producing two changes. First, glucose groups are split off of the lanatoside A molecule and,

2. See Tariff Classification Study and Background Materials (1960), printed for the use of the Committee on Ways and Means, Schedule 4, Part 3, page 85, cited by the Government, for a comment on the

effect of the ruling in the *Chemical Specialties* case.

3. A species of the plant commonly known as Foxglove.

second, acetyl groups are split off. Dr. Angliker made it clear that after the glucose is split off, by hydrolysis, what results is acetyl digitoxin. The reaction can be stopped there, he said. "I produced this product, [i. e., acetyl digitoxin] and also Sandoz sells this product." When the acetyl group is split off, digitoxin and acetic acid are produced. In sum, lanatoside A is broken down by enzymatic action alone, in the presence of water and under the proper and carefully-controlled conditions, into digitoxin, glucose, and acetic acid.

Under cross-examination, Dr. Angliker testified:

By Mr. Steinberg [for the U. S.]:

Q. In these enzymatic reactions, isn't it true that you have chemical changes? A. Yes. Here in this case, you see we get digitoxin.

Q. I think it is rather obvious from your testimony up to now that there is chemical change. A. Yes.

Note that this admission was as to "chemical change." It followed upon lengthy and artful dodging by the witness as to whether or not there was a chemical *reaction*, or only "physical" change, which goes to the nub of appellant's contention here.

Appellant attempts to persuade us that the digitoxin is not the result of a chemical reaction or reactions, or even chemical changes, but is the product of the "natural action of the enzymes present in the dried and powdered digitalis leaves." The relation of this contention to the wording of paragraph 34 will be apparent. Appellant must show digitoxin is a "natural" drug. The following colloquy shows how the issue was stated at the trial:

Mr. Steinberg: We don't concede that digitoxin is part of the plant to begin with.

Judge Wilson: Where did it come from?

Mr. Steinberg: It comes about through a chemical change.

Judge Wilson: You are contending, Mr. Carter [for appellant], that the changes are physical changes?

Mr. Carter: Yes, and *there is no chemical change* in the *isolation* of digitoxin. [Our emphasis.]

Mr. Steinberg: I feel before the witness leaves the witness stand, we will show conclusively there is a chemical change.

The witness fulfilled the prediction of Government counsel but before doing so resisted efforts to get him to admit that the "enzymatic reaction" was a chemical *reaction*. His position is typified in the following:

Judge Watson: Let me ask this question: I am a little confused. It would appear that the question is an either/or question. Is an enzymatic reaction a physical reaction, or is an enzymatic reaction a chemical reaction, or does the possibility exist that it can be both a physical and a chemical reaction?

The Witness: No, you are right. That is a very good question. I think it is normally both. It may be both because it is not a simple reaction. It is a lot of reactions.

Judge Watson: Can an enzymatic reaction be described as having neither of the characteristics of a physical reaction nor a chemical reaction? What I am trying to ask, is this a reaction which has its own qualities, which are not necessarily related to either physical or chemical reaction?

The Witness: I think it is an own thing, a very complicated thing, and so we don't say it is chemical or physical. We say it is an enzymatic reaction.

On the other hand, the Government called as its witness Dr. Chap of the U. S. Customs Laboratory in New York, Chief of the Organic Division since 1960, a chemist in government service since 1936, and asked him whether the enzymatic conversion of lanatoside A in water into digitoxin, glucose, and acetic

acid was a chemical reaction. He testified:

Q. Do you have an opinion? A. I have an opinion that it is a chemical reaction.

Q. Will you state your opinion? A. The reaction as shown here [Exhibit G] is a hydrolysis reaction, which although it requires an enzyme in this case, in my opinion it is still a chemical reaction; that the enzyme, which is a large proteinase molecule, whether it acts physically, or subsurface effect, the water, in my opinion, doesn't come from the enzyme, but comes from the water in the surrounding substrate to convert lanatoside A into digitoxin, acetic acid, and glucose.

Dr. Angliker conceded that the "enzymatic reaction" was a hydrolysis. Webster's New International Dictionary (2d Ed.) defines hydrolysis thus:

*Chem.* A chemical process of decomposition involving addition of the elements of water. In many cases it is induced by the presence in small amount of an enzyme, a dilute acid, or other agent. Thus, cane sugar boiled with dilute hydrochloric acid yields a mixture of dextrose and levulose:

$C_{12}H_{22}O_{11} + H_2O = C_6H_{12}O_6 + C_6H_{12}O_6$.

Similarly, diastase hydrolyzes starch into maltose and dextrin.

On the foregoing facts, we are of the opinion that the imported digitoxin, though of vegetable *origin* in the sense that it is made *from* a plant, is not a "natural" drug for the reason that it is manufactured from lanatoside A obtained from digitalis lanata leaves by carefully controlled chemical reactions, albeit they may be induced, under proper conditions, by an enzyme naturally occurring in the digitalis leaves.[4] Water is a chemical substance and it chemically reacts in the course of the enzyme-induced hydrolysis to break down the lanatoside A molecule into three separate compounds, one of which is the importation here.

In the *Chemical Specialties* case, for similar reasons, we held that the drug 21-acetoxy pregnenolone, made from a kind of yam called "cabeza de negra" by a series of chemical steps, was not a "natural" drug. Furthermore, the court there considered the statutory provision of paragraph 34 that the natural drug be "advanced in value or condition." Appellant in that case was contending that advancement included chemical reactions. The court observed that while advancement had been construed to include, in addition to the shredding, grinding, etc., enumerated in the statute, mere extraction with solvents and also concentration of a natural drug, it had never been held to include chemical changes, i. e., change of a compound into a different compound. The court then refused to hold that the acetylization of 21-hydroxy pregnenolone (a substance found in nature) by treatment with acetic anhydride to produce 21-acetoxy pregnenolone was an "advancement." For the same reasons we hold that the imported digitoxin is not a precursor drug "advanced" within this provision of paragraph 34, as appellant contends.

For the two reasons discussed above, we hold that the Customs Court correctly found that appellant has failed to show classification under paragraph 34 to be proper and correctly overruled the protest. The judgment below is affirmed.

Affirmed.

ALMOND, Judge, dissenting, with whom BALDWIN, Judge, joins.

The majority has overlooked an important factor in this case, one which, in my opinion, is controlling in favor of appellant. Accordingly, I respectfully dissent. I begin by readily agreeing that a chemical change is produced during the process in question here, and further I will admit, for argument's sake, that a chemical reaction with water occurs, although the evidence fails to

4. The record indicates that there are known ways of producing digitoxin other than those used by Sandoz Ltd.

establish conclusively the precise nature of the reaction mechanism in enzyme processes. More important, however, is the fact that there is a distinction between a natural drug resulting from a "natural" chemical process, i. e. one occurring as in nature, and a synthetic drug artificially produced by combining chemicals. Exemplary of the former process is that involved here, while the latter process would be typified by those alluded to in footnote 4 of the majority's opinion, for example, removal of the acetyl group of the lanatoside A by the use of an alkali.[1]

I believe the record bears this out. The majority has already pointed out that digitoxin is present in the digitalis lanata leaves. With respect to what happens after the glucose and acetyl is split off, appellant's witness, Dr. Emil Angliker, testified on cross-examination:

Q. Would you still have lanatoside A? A. No. When this is split off, and this is split off, then we get by natural reaction, by enzymatic reaction, digitoxin. *This is also done in the plants* by building up this lanatoside A. [Emphasis supplied.]

The following colloquy on cross-examination of Dr. Angliker is also pertinent:

Q. What percentage of digitoxin that is commercially produced comes from the digitoxin which you claim is present in the growing leaf? A. Please again.

(The question was repeated)

A. That is below 10 per cent, because I dry the leaves carefully.

When I do not dry it carefully, I have a greater amount of digitoxin.

Judge Watson: When you don't dry the leaves carefully, you get a greater amount of digitoxin?

The Witness: Yes.

Judge Watson: And when you dry the leaves carefully, you get a lesser amount of digitoxin?

The Witness: Yes.

By Mr. Steinberg:

Q. This is due to the amount of enzymes? A. Yes.

Judge Watson: The presence of moisture stimulates the enzymes to produce more digitoxin?

The Witness: Yes. In the fresh leaf, we have about 80 per cent of water, and dry leaves have always 5 to 14 per cent of water. They are not entirely dried.

Appellant's witness, Dr. Shih C. Wang, Professor of Pharmacology at Columbia University Presbyterian Medical Center, testified:

Q. And when you use the term "natural", can you tell us why you think digitoxin is a natural drug? A. Well, in our mind, all these changes, which I think are chemical changes, occur as a continuous process. Nobody knows how the digitalis plant makes these complex molecules. The very fact you put in water, I think all drugs have to be put in water to get it dissolved. The water in the plant will do the same thing, and there are some continuous chemical changes which were not essentially altered by the chemist, although chemists tried to improve the yield, but did not alter

---

1. Appellant argues the natural-synthetic distinction by pointing out, in its brief, that Congress recognized this difference when in Paragraph 28, Tariff Act of 1930 it provided for "natural indigo," a dyestuff produced from the processing of the leaves of the indigo plant by a process closely akin to fermentation and the process here, at a rate different from that provided for "Synthetic indigo." Government counsel, on the other hand, directs the court's attention to a defini-

tion in the headnotes of Schedule 4, Part 3 of the Tariff Schedules of the United States, providing that " 'natural substances' are those substances found in nature * * * and which have not had changes made in their molecular structure as found in nature." While neither of the above is controlling, I am least convinced by the government's position since digitoxin is found in nature and does not have *its* molecular structure, as found in nature, changed.

**1402**

it. Furthermore, the active principle does not reside in the lactone. It resides in the other part of the molecule.

On cross-examination he stated:

Q. Do you know whether lanata leaves are ground up and used—A. As medicine, yes. It is still used today.

The government's own witness, Dr. James J. Chap, testified:

Q. Do you distinguish between what I will term a natural chemical reaction, such as occurs in the body, or in any living organism, and synthetical chemical reaction caused by the addition of two chemicals to each other? Do you distinguish between them? A. Yes, I do.

The above testimonial evidence points out, in my opinion, that a real and valid distinction exists between natural and synthetic drugs and processes.[2] Further, it demonstrates that the process here involved is essentially a natural one, apparently the same process that occurs in nature within the digitalis lanata plant when lanatoside A is being converted to digitoxin by means of the naturally present enzymes and moisture. Appellant assists and encourages nature, to be sure, yet the only differences from the natural process appear to lie in the physical conditions under which the process proceeds. Such differences in water temperature, agitation, etc. are not differences in kind. It is my view, therefore, that digitoxin is a "natural" drug. The cases cited by the majority are distinguishable on their facts. In Chemical Specialties Co. v. United States, 43 CCPA 93, C.A.D. 614 (1956), the drug in question *never* existed in

nature and actually was synthesized from a plant by a series of chemical reactions. Organon, Inc. v. United States, 50 CCPA 17, C.A.D. 812 (1963), is no more pertinent in that the issue there centered around the question of whether the drug as found in the natural state had "therapeutic or medicinal properties."

As to whether the drug has been "advanced in value or condition," I again disagree with the majority. This term, appearing in paragraph 34 which provides for duty at 5 percent ad valorem, is to be contrasted with the term in substantially similar paragraph 1669 reciting "not advanced in value or condition." The latter paragraph provides for admittance free of duty. In *Chemical Specialties*, this court stated:

* * * we are of the opinion that *the* chemical change involved *in the present case* is not included in the meaning of "advanced" as it appears in paragraph 34 * * *." [Emphasis added.]

* * * There is one idea present in these [earlier] cases, namely, that a basic criterion for an imported substance to be classified under paragraph 34 * * * is that it must have existed as such in the source from which it was obtained regardless of the manner in which it was extracted.

It is to be noted that here the imported substance, digitoxin, does exist as digitoxin in the source, the digitalis lanata leaf, and that approximately ten percent of the commercially produced digitoxin comes from that present in the growing leaf. It seems to me, therefore, that *some* chemical changes, especially the

2. An interesting and further enlightening fact of record on this point involves the remarks of one James E. Murphy, a chemist with a company manufacturing digitoxin and the author of four publications in the digitalis field. Mr. Murphy was called by the government and then later withdrawn. Government counsel desired to have the witness say that the book May's Chemistry of Snythetic Drugs was an authority. The following colloquy occurred:

Judge Oliver: Do you look upon this May's volume as an authority for the digitalis that is imported in this case?
The Witness: No.
Judge Oliver: You do not.
The Witness: No.
Judge Oliver: You look on it as an authority in the synthetic field?
The Witness: Yes, synthetic pharmaceutical field.

*natural* enzymatic reactions involved in the present case, are included in the meaning of "advanced" in paragraph 34. In the *Organon* case and in the majority opinion, there seems to be an implicit belief that if there is *any chemical* change *whatsoever*, the drug is not "advanced in value or condition." In my view this is not the law and was not the holding in the *Chemical Specialties* case. Nevertheless, the evidence here unequivocally demonstrates that substantial physical steps such as powdering, and extraction in purifying the product have taken place. Such have been included in the term "advanced in value." Moreover, I do not find this individual drug, digitoxin, to be "compounded" as that word is commonly understood with regard to drugs. I would reverse.