**PHARMACIA FINE CHEMICALS, INC.**

v.

**UNITED STATES.**

C. D. 4193; Protest No. 66/9422–7661–64.

United States Customs Court,
First Division.
March 29, 1971.

Serko & Sklaroff, New York City (Murray Sklaroff and David Serko, New York City, of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Brian S. Goldstein and Joseph I. Liebman, New York City, trial attorneys), for defendant.

Before WATSON, MALETZ and RE, Judges.

WATSON, Judge:

This protest places in issue the classification of a substance known as "clinical dextran" which was classified as a synthetic drug pursuant to item 439.50 of the Tariff Schedules of the United States. The merchandise was assessed with duty at the rate of 10½ per cent ad valorem. Plaintiff claims that clinical dextran is either dutiable at the rate of 3 per cent ad valorem as a natural drug, advanced, pursuant to item 439.30 of the tariff schedules or free of duty as

a crude natural drug pursuant to item 439.10 of said schedules.

The relevant statutory provisions read as follows:

## STATUTES

Tarriff Schedules of the United States:

Schedule 4, Part 3:

Part 3 headnotes:

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

3. For the purposes of this part—

(a) *"natural substances"* are those substances found in nature which comprise whole plants and herbs, anatomical parts thereof, vegetable saps, extracts, secretions and other constituents thereof; whole animals, anatomical parts thereof, glands or other animal organs, extracts, secretions and other constituents thereof, and which have not had changes made in their molecular structure as found in nature;

(b) a *"synthetic-substance"* is a chemical compound made by the artificial combination of elements or radicals by any physical or chemical process;

(c) the term *"crude"*, as used in relation to natural products, means any product which has not been advanced in value or improved in condition by shredding, grinding, chipping, crushing, distilling, evaporating, extracting, by artificial mixing with other substances or by any other process or treatment beyond that which is essential to its proper packing and the prevention of decay or deterioration pending manufacture; and

(d) the term *"advanced"*, as used in relation to natural products, means any product which has been advanced in value or improved in condition from its crude state by any mechanical or physical process whatever beyond that which is essential to its proper packing and the prevention of decay or deterioration pending manufacture, but does not include any product which has been artificially mixed with other substances or the molecular structure of which as found in nature has been changed.

Subpart C

Drugs, not provided for in subpart A or B of this part:

Claimed as:

Natural drugs, crude or advanced:

| | | |
|---|---|---|
| 439.10 | Crude ..................................... | Free |
| 439.30 | Advanced ............................... | 3% ad val. |

Classified as:

| | | |
|---|---|---|
| 439.50 | Other, including synthetic drugs .............. | 10.5% ad val. |

██ The testimony reveals that the clinical dextran in question is produced by a process which begins with the placing of certain bacteria in contact with sugar and other growth factors under carefully controlled environmental conditions. As is their natural behavior, the bacteria begin to produce dextran, a polysaccharide of high molecular weight, through a process of fermentation. When the bacteria have produced the desired amount of dextran, which stage is evidenced by the degree of viscosity, the fermentation is stopped by the addition of alcohol which kills the bacteria and precipitates the dextran. This dextran, which is referred to as "native" dextran is then dissolved in water and hydrochloric acid is added for the purpose of inducing a process of hydrolysis in which the long chains of "native" dextran are broken down into shorter chains of dextran of a specifically desired molecular weight. This dextran is known as "clinical" dextran and is used as a plasma extender. There is no dispute that the importation is a drug.

The testimony supports the view that dextran is a secretion of the bacteria produced in the course of their natural life processes. Although the conditions surrounding the production of dextran are controlled so as to encourage the most efficient production, the actual fabrication of the dextran by the bacteria is identical to that which takes place in the natural state. The only difference between "native dextran" as produced by the bacteria and the final product of "clinical" dextran, is the length of the molecular chain. Their chemical constitution and molecular structure are identical.

It would appear at first glance that plaintiff's position in this issue is firmly in consonance with the definitions set forth in the headnotes to Schedule 4, Part 3, of the Tariff Schedules of the United States relating to natural and synthetic substances, *supra*. In fact, after thorough consideration of the statutory language, the available precedents and the arguments of defendant, we find that the first impression is confirmed and strengthened.

The importation has been classified as a synthetic substance which term has been carefully defined in headnote 3(b) to Schedule 4, Part 3, as a chemical compound made by the artificial combination of elements or radicals by any physical or chemical process. We are of the opinion that the importation does not conform to the requirements of this definition. The testimony clearly indicates that "clinical" dextran is formed in the manner in which dextran itself is formed, namely, by the natural process of bacterial fermentation. The chemical process which results in dextran herein, is a *natural* process and the combinations and manipulations effected by the bacteria on the fundamental chemical constituents are *natural* ones.

Defendant apparently recognizes that the plain meaning of the definition of synthetic substances does not cover the dextran in question and therefore attempts to expand the scope of the term "artificial" as used in this definition. In particular, defendant emphasizes the artificial environmental conditions under which the bacteria produce the dextran. We are of the opinion, however, that a distinction must be drawn between artificiality in the conditions surrounding the production of a substance and the artificiality in the actual fabrication of the substance in question.

There is no good reason why the mere fact that the phenomena we are dealing with take place at the microscopic and molecular level should preclude the application of plain meaning, common sense and reasoning by analogy from macroscopic events. If someone were to argue that the milk sold in food stores is a synthetic product because the cows are induced to lactate by artificial methods, are fed artificial food supplements, are housed under artificial conditions and the milk itself is subjected to a number of purification and preparation processes, we would probably reject that argument. We would do so because we distinguish between artifice in the basic

formation of the substance and artifice in the conditions affecting the basic formation.

■ In a chemical context, this calls for a distinction precisely like that set forth in the Tariff Schedules of the United States. Artifice in the basic formation of a substance is equivalent to synthesis and entails the "artificial combination of elements or radicals by any physical or chemical process" as set forth in the headnote definition of synthetic substances. On the other hand, in our view, the TSUS definition of natural substances allows artifice in the conditions *surrounding* formation of natural substances so long as they "have not had changes made in their molecular structure." The statute places a reasonable and workable limitation on such artificial assistance. It must not involve changes in the molecular structure, which in our view is the equivalent of a change in chemical identity. We view the headnote definitions of "natural" and "synthetic" as providing a clear and complementary understanding of the dividing line between natural and synthetic substances which should serve well in interpreting those tariff provisions which rely on distinctions between natural and synthetic. When the headnotes speak of a change in molecular structure, we believe it is equivalent to the artificial combination of elements or radicals in the definition of synthetic substance, that is to say, the chemical identity of the substance which emerges is different from the identity of those which were extant at the start of whatever process is involved. A substance which is found in nature in the secretion of a plant remains a natural substance even though the conditions under which it is formed are artificially controlled. The record abundantly supports the finding that dextran remains the same chemical compound even though long chains of its polymer form are reduced to shorter lengths by hydrolysis. This relates closely to our holding in Chemirad Corporation v. United States, 65 Cust.Ct. ——, C.D. 4067. In that case we

held that a polymer was a single chemical compound regardless of the variations in length and branching of the molecular chains. A logical corollary of this reasoning is that the length of the molecule of a polymer does not affect whether or not it is a certain chemical compound. Thus, the cutting of a polymer molecule so that the long chain is transformed into shorter chains does not make it a different chemical compound; nor does it transform a natural chemical substance into an artificial one. The process begins with dextran and ends with dextran. Both are the same chemical substance and both are natural substances.

Defendant relies on three cases to support its views that the process by which the instant importation is produced is one which disqualified it as a natural drug. These cases are Chemical Specialties Co., Inc. v. United States, 43 CCPA 93, C.A.D. 614 (1956); Organon, Inc. v. United States, 50 CCPA 17, C.A.D. 812 (1963); Sandez, Inc. v. United States, 57 CCPA 44, C.A.D. 974 (1969). We find nothing in these decisions to justify a decision different from that we reach herein. The 1930 Tariff Act under which these cases were decided, did not have a provision for synthetic drugs. These cases dealt with the question of whether certain chemical substances were within the scope of the provisions for advanced natural drugs.

In the *Chemical Specialties* case, our appellate court held that the importation known as 21-acetoxy pregnenolone and derived by chemical processes from yams, was properly classified pursuant to paragraph 5 of the Tariff Act of 1930, a general provision for chemical compounds, not specially provided for. It rejected appellant's claim that the importation was properly classifiable pursuant to the provisions of paragraph 34 for natural, uncompounded drugs advanced in condition. It did so primarily on the ground that the evidence did not establish that an intermediate source material of the importation formed at the stage directly prior to the formation

of the importation and known as 21-hydroxy pregnenolone, was itself a drug possessing therapeutic properties and chiefly used as a medicinal. It followed logically that the importation could not be the advanced form of a drug if in its unadvanced form it was not a drug at all.

The Court of Customs and Patent Appeals gave additional reasons for rejecting appellant's claim. It noted that the importation and its immediate chemical predecessor, the 21-hydroxy pregnenolone did not exist in the yam which was the original source material and hence could not be "natural" within the meaning of paragraph 34. In addition, at page 98, the court found that the importation could not be uncompounded "[s-"[s]ince the imported 21-acetoxy pregnenolone did not exist in the [yams], but was synthesized therefrom by a series of chemical reactions." (It was stipulated by counsel that the 21-hydroxy pregnenolone was acetylated with acetic anhydride to form the importation. This means that an acetate group was substituted for a hydroxyl group at a certain point in the molecule.)

In the course of a further discussion of whether the importation met the definition of "advanced" in paragraph 34, the court expressed the view that the chemical changes undergone by the importation were more than those contemplated by the term "advancement".

The *Chemical Specialties* case is specifically named by the Tariff Commission as providing the basis for the distinction in the TSUS between natural and synthetic drugs.[1] We recognize the importance of that case and welcome the opportunity to discuss it, extracting its essential principles and distinguishing its facts from those herein. We note that unlike the 21-acetoxy pregnenolone, the importation herein is itself found in nature as a secretion of the same bacteria used to produce it under controlled conditions. Unlike the 21-acetoxy preg-

nenolone, the importation is not derived from its immediate predecessor material by a process of modification of the molecular structure, that is to say, it does not undergo a change of identity equivalent to synthesis. The substitution of an acetate group for a hydroxyl group was clearly a change in molecular structure and identity which would violate the headnote definition of natural substances. Conversely, what was done to the importation in the *Chemical Specialties* case is exactly what is envisioned by the headnote definition of synthetic substance, a manipulation of chemical radicals. Thus, the *Chemical Specialties* case, insofar as it influenced the TSUS headnotes, stands for the proposition that a chemical process destroys "naturalness" when it transforms the identity of the substances involved and said process does not take place in nature.

Since in our view the instant importation possesses, in its manufacture and processing, none of the defects attributed to the importation in the *Chemical Specialties* case, we consider that case to be in harmony with the conclusions reached herein.

The case of Organon, Inc. v. United States, 50 CCPA 17, C.A.D. 812 (1963), involved an importation of heparin which was classified as a medicinal preparation, not specially provided for under paragraph 5, *supra*, and claimed classifiable as a natural advanced drug under paragraph 34, *supra*. The importation, chemically identified as a mucopolysaccharide, was a polymer. In the tissue from which it was derived it was uniformly attached to a protein molecule. This attachment was severed by a process of hydrolysis.

In Organon, Inc. v. United States, the Court of Customs and Patent Appeals again focused primarily on the question of whether the immediate predecessor of the importation, [heparin attached to a protein molecule] was a drug. The court found that it was not a drug, stat-

1. Tariff Classification Study, Explanatory and Background Materials, Schedule 4, Part 3, Page 85.

ing that the *"basic chemical structure which confers on Heparin \* \* \* its specific therapeutic properties* is present in the Heparin when it is tied to a protein, but the *therapeutic properties per se* are *not* present until the Heparin is set free from the protein through a chemical reaction." The court also noted that the hydrolysis of the original material involved a chemical change and at page 21 referred to uncontroverted testimony that the process creates new chemical products.

We distinguish the facts in the *Organon* case from those herein. In this case, although the process of hydrolysis is utilized, it is not to effectuate a chemical change of identity or sever one distinct molecule from another, but simply to reduce the length of the same molecule. We are of the opinion that the court in the *Organon* case, in specifically acknowledging the controlling effect of the *Chemical Specialties* case, was continuing the view implicit therein that the chemical changes which destroyed "naturalness" were changes affecting the chemical identity of the substance involved.

Sandoz, Inc. v. United States, 57 CCPA 44, C.A.D. 974 (1969), involved an importation known as digitoxin, stipulated to be of vegetable origin and to possess medicinal properties. It was classified under paragraph 5 as a medicinal preparation and claimed to be a drug of vegetable origin, advanced in value, etc. under paragraph 34. The digitoxin in question was derived from the leaves of the *digitalis lanata* plant by a process in which a molecule known as lanatoside A was broken down by enzyme-induced hydrolysis into digitoxin, glucose and acetic acid. The court minimized the appearance of digitoxin as a natural occurrence in the leaves of the digitalis lanata plant, stating that "[i]t clearly appears that while the digitalis lanata leaves may contain a very small amount of digitoxin, the imported digitoxin which is produced in the course of the above-described manufacture was not present as such in the leaves, at

least for the most part." Our appellate court upheld this court's finding that the importation was not a natural drug. It expressed its opinion as follows at page 48:

> \* \* \* [W]e are of the opinion that the imported digitoxin, though of vegetable *origin* in the sense that it is made *from* a plant, is not a "natural" drug for the reason that it is manufactured from lanatoside A obtained from digitalis lanata leaves by carefully controlled chemical reactions, albeit they may be induced, under proper conditions, by an enzyme naturally occurring in the digitalis leaves.[4] Water is a chemical substance and it chemically reacts in the course of the enzyme-induced hydrolysis to break down the lanatoside A molecule into three separate compounds, one of which is the importation here.

[footnote omitted]

It is necessary to discuss the *Sandoz* case as it relates to two issues herein, the issue of whether the "native" dextran is a natural substance and the issue of whether the "clinical" dextran is a natural substance. As to the former, it is abundantly clear that "native" dextran by the very nature of its production by the secretion of bacteria, is always present in a state of nature. It cannot be said of dextran, as it evidently was of digitoxin, that it is not present in sufficiently meaningful quantity in a state of nature. Since we do not view "clinical" dextran as differing in essence from "native" dextran and since it constitutes 10% of untreated "native" dextran, we do not consider it directly comparable to digitoxin.

As to the latter issue of whether the hydrolysis utilized to produce "clinical" dextran is a chemical change which makes the resulting substance "unnatural", we are of the opinion that it is not the hydrolysis which is the determining factor, it is the purpose for which it is used. In the case of the instant importation hydrolysis was used to produce a range of molecular weights of an other-

wise unchanged substance. This differs from the cases such as *Organon,* in which chemical reactions such as hydrolysis were used to effectuate such chemical changes as separating molecules of one substance from molecules of another substance or cases such as *Sandoz* in which the chemical reaction entailed breaking down a complex molecule into molecules of different substances. The essential determining factor in whether a substance was natural in the *Chemical Specialties* case was whether the precursor material had undergone a change of chemical identity, not simply whether a chemical process had taken place. This continues to be the rationale underlying the distinction between natural and synthetic substances under the TSUS and it appears to be a rationale which can preserve a semblance of order in a potentially chaotic area.

In sum, we distinguish *Sandoz* insofar as in that case the importation was not considered to be present in nature in a significant amount as a result of natural processes and insofar as the disqualifying chemical reactions therein were reactions which broke down a complex molecule into substances of different chemical identity. We further distinguish that case on the ground that it dealt with statutory language which did not contain the clear juxtaposition of "natural" and "synthetic" present in the TSUS and lacked the detailed and clarifying insight into the meaning of these terms set down in the headnotes.

■■ With respect to the question of whether the importation is in a crude state or a state of advancement, we incline to the latter view. "Native" dextran represents the importation in an unadvanced form. We are of the opinion that the use of hydrolysis to reduce the molecular weight of a polymer should be judicially construed to come within the intent of the definition of advancement. The underlying statutory scheme based on chemical changes of *identity* should control our view of the definition of advancement. This scheme

will be thrown into disarray if the lengthening and shortening of polymers is viewed as producing new substances and if the concept of advancement is not interpreted to encompass advancement by chemical means which do not affect chemical identity. Thus, despite that definition's reference to mechanical or physical processes as means of advancement, we are of the opinion that a chemical process which does not affect chemical identity should be a legal equivalent. In this case, hydrolysis is a technique of advancement which does not change molecular structure. This is in keeping with our finding that a change in molecular structure as that term is used in the TSUS, refers to a change in chemical identity. (See Chemirad Corporation v. United States, *supra.*) By this interpretation we distinguish the lengthening or shortening of a polymer from other chemical processes and consider it more in the nature of an advancement technique covered by the definition in headnote 3(d).

Further, we note that the headnote definition of "crude" *supra,* excludes any product which has been advanced in value or improved in condition by "any other process or treatment" beyond that essential to its packing and preservation. We consider this broad language to represent a clear exclusion of the hydrolysis herein. The definition of "advancement" in terms of mechanical and physical means does not have the same express exclusionary rigidity. The anomalous situation of a natural drug which is neither crude nor advanced is thus avoided by recognizing the clear exclusionary character of the definition of "crude" and the amenability of the definition of advancement to a process which does not affect chemical identity.

In conclusion, for the reasons set forth at length above, we hold that the importation herein is properly classifiable as an advanced natural drug pursuant to item 439.30 of the TSUS. We are of the opinion that this result is in keeping with the intent of the Tariff

Schedules of the United States in that it gives primacy to the plain meaning of the statutory terms. It also acknowledges the importance of the headnote definitions and recognizes the painstaking care which was taken in formulating them as part of an overall harmonious pattern.[2] Finally, we have sought to perpetuate the true distinctions between "natural" and "synthetic" which are to be found in the *Chemical Specialties* case and which, as continued into the headnotes, give the best promise of a degree of certainty in the classification of chemical importations.

Judgment will issue accordingly.

2. Tariff Classification Study, Explanatory And Background Materials, Schedule 4, Explanatory Notes, page 3.