SCHERING CORPORATION, PLAINTIFF *v.* THE UNITED STATES, DEFENDANT

Court No. 76-9-02111

Before BOE, Judge.

(Decided March 24, 1981)

*Barnes, Richardson & Colburn* (*James S. O'Kelly* at the trial; *Michael A. Johnson* with him on the brief) for the plaintiff.

*Thomas S. Martin,* Acting Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Saul Davis* at the trial and on the brief) for the defendant.

BOE, Judge: The subject merchandise in the above-entitled action is the chemical compound L-ephedrine hydrochloride, a crystalline alkaloid salt, which was exported from Shanghai, China, and entered at the port of New York on May 14, 1976.

Upon liquidation the merchandise was classified by Customs as "synthetic" under item 437.20, TSUS. Plaintiff, however, contends that the merchandise is natural and, therefore, properly classifiable under item 437.22, TSUS. The relevant statutory scheme provides:

SCHEDULE 4.—CHEMICALS AND RELATED PRODUCTS

PART 3.—DRUGS AND RELATED PRODUCTS

*Part 3 headnotes:*

\*　　\*　　\*　　\*　　\*　　\*　　\*

3. For the purposes of this part—

(a) *"natural substances"* are those substances found in nature which comprise whole plants and herbs, anatomical parts thereof, vegetable saps, extracts, secretions and other constituents thereof; whole animals, anatomical parts thereof, glands or other animal organs, extracts, secretions and other constituents thereof, and which have not had changes made in their molecular structure as found in nature;

(b) a *"synthetic substance"* is a chemical compound made by the artificial combination of elements or radicals by any physical or chemical process;

\*　　\*　　\*　　\*　　\*　　\*　　\*

Alkaloids and their esters, ethers, salts, and other compounds:

\*　　\*　　\*　　\*　　\*　　\*　　\*

Other alkaloids and their compounds:

| | | |
|---|---|---|
| 437.20 | Synthetic_____ | 25% ad val. |
| 437.22 | Natural: Not artificially mixed__ | 10% ad val. |

The pharmaceutical company in the People's Republic of China, engaged in the production of the imported merchandise, deems the details thereof to be a trade secret. Upon the motion by counsel for plaintiff, evidence as to the process described in the record, pursuant to an order of the court, was presented in camera. Plaintiff's counsel having renewed its request that such evidence be accorded the same confidentiality in the briefs of respective counsel and that circulation thereof accordingly be restricted, this court in conformity with counsel's request and in summarizing the process used in the production of the merchandise in question will neither attempt to detail herein the specific steps required nor the exact proportions of chemicals used during the process.

In the production of L-ephedrine hydrochloride, quantities of the dried stems of the herb, *Ephedra sinica* Stapf, also known as Ma Huang, are cut into small pieces. This cut material is then placed into an extraction vessel wherein large quantities of water are added, heated with live steam, thereby building up the pressure in the vessel. The extraction process is repeated several times, yielding

an aqueous extract; the used stems are discarded as waste product. Sodium hydroxide, a strong base, is added to the aqueous extract, making the extract alkaline. In this alkaline environment, the ephedrine exists as an electrically neutral base and in this form the ephedrine (along with a related substance, pseudoephedrine) is extracted out of the aqueous solution and into an organic solution by the addition of the organic solvent, toluene. Subsequent steps in the production process involve the treatment of the ephedrine base with a solution of oxalic acid, creating the alkaloid salt, ephedrine oxalate. Following a crystallization process by which the pseudoephedrine is separated out, the ephedrine oxalate crystals are put into solution, and a calcium chloride solution is added, precipitating out calcium oxalate. The solution that remains after the removal of certain impurities, results in the L-ephedrine hydrochloride crystals which are the subject merchandise herein.

In addressing the issues determinative of the instant cause of action, the court, in conjunction with the professional presentations relating to organic chemistry and its application to the within proceedings made by learned witnesses, necessarily must apply to such testimony legal principles which may or may not conform to the rationale of the scientific scholar.

Upon the plaintiff rests the dual burden of proving that the classification made by Customs is in error and that its claimed classification is correct. Thus, in examining and considering the evidence adduced by the plaintiff, the court directs its immediate and initial attention to the sufficiency thereof in support of its claim that the imported merchandise is natural. Unless the plaintiff is able to so establish its claim, this cause of action fails.

In order to be a natural substance within the meaning of headnote 3(a) of schedule 4, part 3, the imported merchandise must satisfy two criteria: (1) It must be found in nature in a vegetable or animal source; and (2) it cannot have had changes made in its molecular structure as found in nature. For the reasons hereinafter stated, the court finds that neither of these criteria have been met, and, accordingly, the imported merchandise cannot be classified as "natural" within the meaning of schedule 4, part 3 of the tariff schedules, as claimed by plaintiff.

A substance is "found in nature", within the meaning of headnote 3(a), when that substance exists as such in the vegetable or animal source from which it is produced and serves as the starting substance to produce an imported product. *See: United States* v. *Pharmacia Fine Chemicals*, 59 CCPA 196, 463 F. 2d 1370 (1972); *Sandoz, Inc.* v. *United States*, 57 CCPA 44, 418 F. 2d 1396 (1969) and *Chemical Specialties Co.* v. *United States*, 43 CCPA 93, C.A.D. 614 (1956). The undisputed

evidence indicates that in the Ma Huang plant stem virtually all of the ephedrine is protonated, that is, there has been added to its basic structure a positively charged hydrogen atom, making the protonated ephedrine a positively charged particle. Such particles with positive electrical charges are termed cations. Again, it is undisputed that scientific theory has established that, in solution, cations are associated with negatively charged particles termed anions. The evidence also demonstrates that there is more than enough chloride anions in the plant stem to associate with all of the ephedrine cations in the plant. The underlying inquiry which accordingly must be determined is whether in the plant itself ephedrine cations and chloride anions exist in an association as to create the salt, L-ephedrine hydrochloride.

The evidence presented shows that the structure of the plant stem cannot be likened to a glass beaker containing a solution, the contents of which can all freely move about. The plant stem contains, among other structures, cell walls, providing a barrier between the contents of a cell and its outside environment, and vacuoles, the contents of which are separated from the rest of the cell by means of a semipermeable membrane. Plaintiff's witness, Mr. McGlotten, acknowledged that he did not know whether the ephedrine cations and chloride anions were present in the same portions of the plant stem.[1] Without evidence that the ephedrine cations and the chloride anions are not precluded by their locations within the stem from being in proximity with each other, it cannot be presumed that these cations and anions have become associated therein, resulting in the creation of L-ephedrine hydrochloride within the plant stems.

For the purpose of proving that L-ephedrine hydrochloride is "found in nature," it would be insufficient to demonstrate that only a de minimis quantity of L-ephedrine hydrochloride existed in the plant stems. The L-ephedrine hydrochloride must have served as the starting substance for the production of the imported merchandise. *See: United States* v. *Pharmacia Fine Chemicals, supra; Sandoz, Inc.* v. *United States; supra.* In *Sandoz,* the court found that digitoxin was not natural where only 10 percent of the imported merchandise was produced from digitoxin native to the plant. In the case at bar, the extensive chemical analysis of the stems by Dr. Flor showed that the L-ephedrine cation and the chloride anion in the plant stem represented very small percentages of the positive charges and negative charges, respectively, in the stem. Cations that were far more predominant than L-ephedrine in the Ma Huang stem included calcium, magnesium, and potassium representing, respectively, 72.57,

---

[1] The testimony of Mr. McGlotten and that of Dr. Flor, the witnesses for the plaintiff and defendant, respectively, who had done chemical analyses of the Ma Huang stems, indicate that cell walls had to be disrupted in order to analyze the chemical contents of the stems.

12.37 and 10.63 percent of all cations in the Ma Huang stem (R. 199). These, in addition to pseudoephedrine cations as well as others might well compete with the L-ephedrine cation for the chloride anion, again depending on their respective locations within the plant cellular structure. In addition to the chloride anion in the stem, Dr. Flor found significant amounts of oxalic acid, which, in the presence of an ephedrine base, could associate with all of the ephedrine to produce ephedrine oxalate.[2]

Despite all of these possible ionic combinations in the stems, plaintiff argues that the chloride anions are more likely to associate with ephedrine cations than other anions that might be present in the plant stem. The rationale for this conclusion, as related in the testimony of Mr. McGlotten, is that the L-ephedrine base being a strong base, would combine more readily with a strong acid such as hydrochloric acid, to form the salt L-ephedrine hydrochloride. However, plaintiff has provided no evidence wherein it appears that hydrochloric acid (HCL) exists in the plant stem, and in such quantity as to be able to combine with all of the ephedrine base to produce the L-ephedrine hydrochloride. The absence of any evidence that chloride is in fact bonded to the hydrogen in the plant stem, in the form of hydrochloric acid, makes plaintiff's assertions as to the affinity of the ephedrine cation for the chloride anion mere speculation.

In summary, plaintiff has failed to show that naturally occurring L-ephedrine hydrochloride serves to produce the imported merchandise. In fact, plaintiff has failed to prove that *any* L-ephedrine hydrochloride exists in the Ma Huang stem. This court, accordingly, cannot find that L-ephedrine hydrochloride is "found in nature" within the meaning of headnote 3(a) of schedule 4, part 3.

Assuming, for the sake of argument that plaintiff could establish that L-ephedrine hydrochloride is "found in nature" within the meaning of headnote 3(a), plaintiff's claim that the subject merchandise is "natural," nevertheless, must fail inasmuch as plaintiff has failed to establish that the substance found in nature, that is, L-ephedrine hydrochloride "[has] not had changes made in [its] molecular structure as found in nature" within the meaning of headnote 3(a). This latter criterion of headnote 3(a) distinguishes "synthetic substances" from "natural substances" based on whether these substances have or have not undergone chemical changes subsequent to their "natural" production. *Pharmacia Fine Chemicals, supra.* We interpret this statutory criterion, as well as the case law construing it, to require that the original and natural L-ephedrine hydrochloride must re-

---

[2] Dr. Flor also found the presence of phosphate anions and sulfate ions in the stem, which could compete with the chloride anions for the ephedrine cation, but the phosphates and sulfates were not quantified.

main identifiable at all distinct stages in the production of the imported merchandise. Cf. *Ciba-Geigy Corporation* v. *United States*, 65 CCPA 80, 582 F. 2d 26, C.A.D. 1210 (1978) (construing headnote 3 of schedule 4, part 1).

Continuing to assume, arguendo, that L-ephedrine hydrochloride has been extracted from the Ma Huang stems into an aqueous extract using an extraction vessel as described above, upon the addition of sodium hydroxide supplied from an outside source to the aqueous extract, the L-ephedrine hydrochloride, a salt, is destroyed and the L-ephedrine is chemically changed into a base. This reaction involves the removal of a proton (and thereby the positive charge) from the L-ephedrine cation, resulting in its disassociation from a chloride anion or, in fact, from any other anion with which it might be in association. In a subsequent step, the L-ephedrine base is further chemically changed into L-ephedrine oxalate when the L-ephedrine base reacts with oxalic acid solution which has been supplied from an outside source. This reaction involves the protonation of two L-ephedrine bases, and their association with a single oxalate anion. Again subsequently, the L-ephedrine oxalate chemically reacts with a calcium chloride solution which likewise has been supplied from an outside source, resulting in the formation of L-ephedrine hydrochloride. This reaction involves an ionic interchange, that is, the oxalate anion associated with the L-ephedrine cations, becomes associated with the calcium cation and the chloride anions associated with the calcium cation becomes associated with the ephedrine anion.

According to the testimony and exhibits, the L-ephedrine hydrochloride, L-ephedrine and L-ephedrine oxalate, respectively existing at various stages of the production process, all have different molecular structures and physical properties. The court has noted the testimony of plaintiff's witness, Dr. Breslow, who, in commenting on the molecular changes occurring in the process involving the production of the imported merchandise, characterized such changes as trivial and reversible. To be sure, the concepts and interpretations of those learned authorities in their scientific fields of endeavor may bear a, perspective that is indeed dissimilar to those, including this court who must apply the common meaning and interpretation to an unambiguous word or group of words which have been enunciated by legislative authority. Notwithstanding the comments of witnesses minimizing the extent or nature of the molecular changes as herein referred to, from the evidence presented to this court it cannot be said that no chemical change has taken place subsequent to an alleged extraction of L-ephedrine hydrochloride from within the Ma Huang stems. Suffice it to say, the alleged natural L-ephedrine hydrochloride has not remained identifiable at all of the distinct stages in the pro-

duction of the imported L-ephedrine hydrochloride. Therefore, this court must conclude that plaintiff has failed in its burden to demonstrate that the L-ephedrine hydrochloride "[has] not had changes made in [its] molecular structure as found in nature" within the meaning of headnote 3(a).

Plaintiff has thus failed to prove either of the two criteria which are requisite to establish the imported merchandise a natural substance within the contemplation of headnote 3(a). The definitions of "natural substances" and "synthetic substances" are complementary. *Pharmacia Fine Chemicals, supra.* Inasmuch as the imported merchandise is not classifiable as a "natural" alkaloid compound under 437.22, TSUS, it is, accordingly, properly classifiable under 437.20, TSUS.

Let judgment be entered accordingly.